## COURT OF SPECIAL SESSIONS — NEW YORK — PART VI.

### December 11, 1916.

## THE PEOPLE v. HERMAN GOLDBERGER.

HEALTH LAW—PENAL LAW, § 435—" KOSHER" MEAT.

  Defendant had inscribed on his window "Kosher Meat and Poultry Market." The meat exposed for sale was not "Kosher" but "tref" and was not slaughtered and cared for as prescribed by the Orthodox Hebrew Church. He sold such meat in a wrapper describing it as "Kosher." *Held*, that the sign on the window did not constitute a declaration that all the meat sold or offered for sale was "Kosher" nor that such meat was there for sale at all times and that defendant had not "with intent to defraud sold or exposed for sale any meat and falsely represented the same to be 'Kosher.'"

  FRESCHI, J., dissenting.

Before: — HON. CLARENCE EDWARDS, P. J.; HONS. HENRY W. HERBERT and JOHN J. FRESCHI, JJ.

Appearances: — *Albert B. Unger, Deputy Assistant District Attorney.*

*Charles G. F. Wahle,* for defendant.

EDWARDS, J. (concurring):

  The penal quality of the statute must be borne in mind. "Kosher meat and poultry market" means a place where such meat and poultry are sold,— not necessarily exclusively. This inscription on the defendant's window did not constitute a declaration that all the meat sold or offered for sale in the

premises was " kosher " meat, nor was it a declaration that such meat was there for sale at all times.

I vote to acquit on the ground that the evidence does not show that the defendant, " with intent to defraud, sold or exposed for sale any meat and falsely represented the same to be kosher."

HERBERT, J., concurs.

FRESCHI, J. (dissenting) :

An inspector of the Board of Health of the city of New York, one Harry Roistacher, together with Rabbi Benjamin Levi and Nathan Liebow, a representative of the Hebrew Retail Kosher Meat Butchers' Federation, at 6:30 o'clock in the forenoon of April 5th, 1916, visited the premises No. 200 Second avenue, in the said city, where the defendant then maintained and conducted a butcher shop, on the show window of which were conspicuously placed and exposed to public view the words as follows: " H. Goldberger, *Kosher* " (in Hebrew characters) " Meat and Poultry Market." The meat exposed for sale at the time in that shop was not what is described as " kosher," but is termed by some of the witnesses and by counsel as " tref." For the purposes of this case " tref " is all such meat or poultry as is slaughtered by methods other than those prescribed by the church of the Orthodox Hebrew; and, if prepared in accordance with the ritual of his church, is meat so kept and dealt with as makes it ritually unfit and unclean as food, and, therefore, prohibited to be partaken as food by the Orthodox Hebrew. " Tref," so far as the religious Jew is concerned, is a forbidden article of food.

It appears that while these witnesses were present in defendant's shop a driver brought some chickens stamped with the word " kosher " on the wrapper, showing this poultry to have been " slaughtered according to the Hebrew ritual," and the

wrapper thereon " came from the Schochat, the ritual slaught-erer."

These are the main facts on which the prosecution bases its case against the defendant for a violation of section 435 of the Penal Law, which statute reads, in part, as follows:

"A person who, *with intent to defraud,* sells or exposes for sale any meat or meat preparation and falsely represents the same to be *kosher,* or as having been prepared under and of a product or products sanctioned by the orthodox Hebrew relig-ious requirements, is guilty of a misdemeanor."

The religious law of the Hebrew was proven, as well as the meaning given to the word " kosher," by well-established and recognized lexicographers; and they establish that " kosher," in this case, is meat which is " ritually fit " for consumption as food by the orthodox Hebrew.

On behalf of the people, Rabbi Bernard Drachman testified concerning the relation of the ecclesiastical history, law and literature of the Hebrew race, to the issue here and as to the meaning of " kosher," and cited various rabbinnical codes of law of the Jewish faith, passages from the Old Testament, the traditions of the Jewish spiritual authorities, and the bibliogra-phy generally as to the question of what is " kosher."   He said: " In the Book of Leviticus there is found what we believe Moses told us as to what is clean and what is unclean with relation to fitness for eating.   In that book there is listed a certain class of animals which it is permitted the orthodox Hebrew to eat and certain animals of which he is forbidden to partake. These animals of which the Jew is forbidden to partake, according to the law of Moses, are animals that are not clean — not ' kosher.' "

To determine the character of the meat in question, the court is not dependent, at least as far as this case goes, upon any rab-binical decision, not upon the rules, customs and tradition of any religion, inasmuch as it is clearly shown that all of the

beef found on the premises was not "kosher." Had the issue presented a claim on the part of the defendant that all the meat was "kosher," then it would be incumbent upon the prosecution to prove beyond a reasonable doubt that the meat in question was not "kosher," in which case the proof might well be subject of attack and challenged, as set forth in defendant's additional memorandum.

There can be no doubt about the right of the defendant, under the laws of the State of New York, to sell any kind of wholesome meat, whether "kosher" or not, as stated by counsel for the defense in his able brief; but I cannot agree with his contention that this law does not prevent the selling of these two kinds of meat — "kosher" and "tref"— from one place of business under the peculiar circumstances of this case.

The crime is made out, in my opinion, not merely by the posting of a sign, advertising "kosher" meat. The inscription of itself, is meaningless and standing alone would not warrant a prosecution, unless it is coupled with the fact that meat that is not "kosher" is exposed for sale as "kosher" at the place of the advertisement. This latter circumstance is the real index of an intent to deceive and defraud. There must be a strict compliance with the advertisement. Here we have undisputed proof that the defendant stated to the health inspector in the presence of others that "he did not sell any 'koshered' meat;" and when asked by the inspector if he had the sign in question "out there," defendant said "he would take it off." These facts, which I must accept as true, establish that the defendant not only failed to conform to the ecclesiastical laws and religious customs of the Jewish faith, governing the orthodox Hebrew, but that — and this is of the essence of the crime — he violated the very definite purpose and spirit of the law invoked in his prosecution.

This law standardizes a certain order of business honesty by forbidding the use of false and misleading advertisements or

labels.    Back of this statute, which is challenged as class legis-
lation, among other respects (see People v. Goldberger and
Schwartz, *N. Y. Law Journal,* Aug. 11, 1916), are the demands
of public policy and the basic principle of honesty in trade,
which necessarily affects the social welfare of the community
in a measure.

The whole trend of modern law is to hold individuals strictly
to account for methods that are disreputable and dishonest, and
to encourage fair methods and honest competition, stimulated
as it must be, by public opinion in the natural progress of
events.    Even in the Federal Trade Commission Law and
related acts, real progressive legislation, sanctioned by the fed-
eral authorities, which make unfair competition unlawful, and
which is declaratory of the common law on the subject, we find
the same underlying principle of the square deal.

The legislation under consideration is designed to prevent
such acts as are complained of here.    While the acts charged
are not necessarily a consummated fraud, at the same time
they constitute an unfair practice which comes within the
scope of this statute.

The policy of this law is universal and governs all persons
who do business in the particular line in question, and mani-
festly fixes a certain standard of business honesty in the inter-
est of the public, who demand fair competition.    This law " is
not limited by definition which would weaken it and offer
opportunities for evasion; " but it makes the court arbiters of
the fact, in determining whether, under all the circumstances,
the defendant had any intent to defraud.    Had the defendant
proven a custom in his particular trade, which he endeavored
to do, but failed, that all, or a considerable number of butchers,
who advertised " kosher," also sold " tref," then he might have
successfully contended that under the law merchant, a law to
which the court could properly go as did Lord Eldon in his time,
the defendant intended no fraud.

The mere possession of meat not " kosher " is not criminal, but the exposure of the meat on the counter in a shop, which is tantamount to an open invitation by the defendant to the public to buy, coupled with a show-window sign which is calculated to suggest the sale of " kosher " therein, it seems to me, furnish a combination of circumstances that must be regarded as a representation as to the character of the meat exclusively sold at that place.

The keeping of meat that is not " kosher," under circumstances amounting to an offer to sell same in a shop where the proprietor advertises " kosher " for sale, and thereby represents that said meat to be "kosher," constitutes a violation of this law. By the sign on the window, the defendant holds out a guarantee to those who are induced to patronize him in his business, that he deals in and sells " kosher " exclusively. Such an inscription is a false advertisement and certainly tends to mislead where " kosher " is not kept for sale; and I do not hesitate to say that I regard such conduct an unfair business method, tending to undermine public confidence, and enabling the perpetration of irreparable wrong. Deception and fraud is one step removed from it and is the natural consquences of such a misleading advertisement. The intent to defraud, I spell out of the circumstances of the case. No individual who posts such a sign, and, thereby, solicits the patronage of the orthodox Hebrew religionist, can be regarded as honest in his intent, when, as here, the defendant is shown to have had no " kosher " meat in the premises and admitted that he did not sell " kosher " meat. Such business methods are to be strongly condemned and definitely suppressed.

Legislation of the kind involved here should be supported in its administration for the protection of the public and to promote fair dealing, especially in holding the dealer responsible for the advertised quality and standard of his products offered for sale. Vice-Chancellor VAN FLEET in Wirtz v. Boilling Co.

(50 N. J. Eq. 164), quoting Mr. Justice KNAPP, from the case of Miller Tobacco Mfg. Manufactory v. Commerce (16 Va. 18, 24) a case dealing with the question of unfair competition in the use of imitative labels and wrappers, said:

" It is no less a dictate of justice than of sound reason, that every person must be understood to have intended to do just what is the natural consequences of his act deliberately done — * * * for it is a matter of common knowledge that the ordinary buyer does not, as a general rule, exercise as much caution in buying an article for which he pays a few pennies as he does in purchasing a more valuable thing. The instances are very rare, I suppose, where a purchaser exercises as much care in buying a bottle of beer as he does in buying a bottle of whiskey, a box of cigars, or a hat or a coat."

An advertisement is, in a way, a representation; it may deal with the quality, character or kind of merchandise or goods that are offered by a merchant in the course of his business. This advertisement may take one of many forms. In the case at bar, it is part of a sign or business inscription on a show window of the defendant's store. The effect of that sign, in its peculiar wording, is equivalent to saying to his customers that " kosher " meat and " kosher " poultry are sold there. An actual labeling of the meats is not a necessary ingredient of the crime, although the use of a false label is made specifically a wrong under this law. There is no claim made here that there was any such label upon the meat itself.

The sale of " kosher " is not limited to a class as, for instance, the Jews. All can freely purchase, who wish to purchase, and, if the people choose to regard " kosher " meat as a cleaner and more wholesome product, surely they are entitled to protection against misrepresentation and possible fraud. It is to be noted that the statute here does not require proof of an actual consummated fraud. Suffice it that there was a false representation or holding out of some statement that is false in

fact. And in this connection the court has not taken judicial notice of anything more than that there exists a body of Hebrews who observe the orthodox requirements of their faith, as a religious entity; but the customs of this particular denomination have been made the subject of proof and it clearly appears that, pursuant to those customs and religious observances, requirements and restraints, the orthodox Hebrew recognizes, as must the community, the necessity for the sale of "kosher;" and the Legislature, in its wisdom, also recognizes that there is a demand for that kind of meat that cannot be desregarded. While it is settled as the law that the ecclesiastical law is not a part of the law of this State, and that rights and obligations are not to be determined by it; yet, the ecclesiastical law in this case is important to determine the application of the word "kosher" in the case of the religious Jew who would not use any meat that is "tref" — meat, as I have stated, which did not come from the permitted animal and which did not receive the proper treatment and that the Jewish law forbids in dietary matters. Furthermore, this spiritual law shows a relation that this statute bears to a certain line of business existing in this community, and to regulate which the law was enacted. The requirements and restraints of the religion of the Hebrew race are so interwoven with the fact side of the case that it demands especial consideration in dealing with the subject-matter here and as identifying the shop in question, as a place where meat is sold that is ritually fit and proper according to the requirements of the Jewish law. The consumer is entitled to the protection of the law against misrepresentation of the kind that figures in this case, as it tends to mislead the public and makes possible the perpetration of the meanest kind of fraud to the serious injury of the public. The supervisory legislation that is involved here is reasonable and seems to qualify the right of the defendant to have and sell merchandise of any other given kind, freely as he might otherwise do; and the Legislature has sought

by this law to provide a safeguard against imposition, all in the public interest. (People v. Goldberger, *supra.*) The law was enacted not to restrict the sale of meat; but it serves to regulate in a definite respect the conduct of butchers in the sale of a certain kind of meat.

The charge, therefore, that the defendant exposed for sale certain meat, falsely represented to be " kosher," and as having been prepared under the orthodox Hebrew religious requirements has been sustained.

In view of all the circumstances and of my opinion as to the construction of this statute; I must dissent from the judgment of the majority of the court, and, therefore, vote to find the defendant guilty.

Defendant acquitted.    Discharged as not guilty.